UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **SHANICE DANIELS,**<br>**Individually and on behalf of all others**<br>**similarly situated,**<br><br>           **Plaintiff,**<br><br>   v.<br><br>**DETROIT QUALITY STAFFING, LLC,**<br><br>           **Defendant.** | **Case No. _____**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**COLLECTIVE ACTION**<br>**PURSUANT TO 29 U.S.C. § 216(b)**<br><br>**CLASS ACTION PURSUANT TO**<br>**FED.  R. CIV. P. 23** |

## ORIGINAL COMPLAINT – COLLECTIVE/CLASS ACTION

Plaintiff—Shanice Daniels—brings this action individually and on behalf of all current and former hourly laborers (collectively, "Plaintiff and the Putative Collective/Class Members"), who worked for Defendant—Detroit Quality Staffing, LLC ("DQS")—anywhere in the United States, at any time from during the relevant time periods, through the final disposition of this matter, to recover unpaid overtime compensation, liquidated damages, and attorneys' fees and costs pursuant to the provisions of Sections 207 and 216(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19, and unpaid straight time wages pursuant to Michigan common law.

## I.
## OVERVIEW

1.      This is a collective action to recover overtime wages and liquidated damages pursuant to the FLSA, and a class action pursuant to the state laws of Michigan under FED. R. CIV. P. 23, to recover unpaid straight time wages and other applicable penalties.

2.      Plaintiff and the Putative Collective/Class Members are those similarly situated persons who worked for DQS at any time during the relevant time periods, through the final

disposition of this matter, and have not been paid for all hours worked, nor the correct amount of overtime in violation of state and federal law.

3. Specifically, DQS misclassified Plaintiff and the Putative Collective/Class Members as independent contractors not subject to the protections of the FLSA.

4. Additionally, DQS failed to pay Plaintiff and the Putative Collective/Class Members for all hours worked.

5. Although Plaintiff and the Putative Collective/Class Members have routinely worked (and continue to work) in excess of forty (40) hours per workweek, Plaintiff and the Putative Collective/Class Members were not paid overtime of at least one and one-half their regular rates for hours worked in excess of forty (40) hours per workweek.

6. Likewise, Plaintiff and the Putative Collective/Class Members worked under forty (40) hours per workweek on occasion and were not fully compensated at their regular rate of pay for all hours worked.

7. During the relevant time periods, DQS knowingly and deliberately failed to compensate Plaintiff and the Putative Collective/Class Members for all hours worked each workweek, and the proper amount of overtime on a routine and regular basis.

8. Plaintiff and the Putative Collective/Class Members did not and currently do not perform work that meets the definition of exempt work under the FLSA.

9. Plaintiff and the Putative Collective/Class Members seek to recover all unpaid overtime compensation, liquidated damages, and other damages owed under the FLSA as a collective action pursuant to 29 U.S.C. § 216(b), and to recover all unpaid straight time and other damages owed under Michigan common law as a class action pursuant to FED. R. CIV. P. 23.

10. Plaintiff also prays that all similarly situated workers (Putative Collective Members) be notified of the pendency of this action to apprise them of their rights and provide them an opportunity to opt-in to this lawsuit.

11. Plaintiff also prays that the Rule 23 class be certified as defined herein, with Plaintiff Daniels designated as the Class Representative of the Michigan Class.

## II.
## THE PARTIES

12. Plaintiff—Shanice Daniels ("Daniels")—was employed by DQS in Michigan during the relevant time periods. Plaintiff Daniels did not receive compensation for all hours worked and did not receive overtime compensation for all hours worked in excess of forty (40) hours per workweek.[1]

13. The FLSA Collective Members are those current and former hourly laborers who worked for DQS, anywhere in the United States, at any time from October 24, 2020, through the final disposition of this matter, and have been subjected to the same illegal pay system under which Plaintiff Daniels worked and was paid.

14. The Michigan Class Members are those current and former hourly laborers who worked for DQS in Michigan, at any time from October 24, 2020, through the final disposition of this matter, and have been subjected to the same illegal pay system under which Plaintiff Daniels worked and was paid.

15. Defendant Detroit Quality Staffing, LLC is a domestic limited liability company, licensed to and doing business in the State of Michigan, and may be served through its registered agent for service of process: **Republic Registered Agent LLC, 405 W. Greenlawn Ave, #G11, Lansing, Michigan 48910.**

---

[1] The written consent of Shanice Daniels is attached hereto as Exhibit A.

## III.
## JURISDICTION & VENUE

16.     This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 as this is an action arising under the FLSA, 29 U.S.C. §§ 201–19.

17.     This Court has supplemental jurisdiction over the additional Michigan state law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's FLSA claim that they form part of the same case or controversy.

18.     Plaintiff has not entered into an arbitration agreement that would affect the Court's subject-matter jurisdiction.

19.     This Court has general and specific personal jurisdiction over DQS because Michigan qualifies as its home state and because DQS employed Plaintiff in Michigan.

20.     Venue is proper pursuant to 28 U.S.C. § 1391 in the Eastern District of Michigan because this is a judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

21.     Additionally, Plaintiff worked for DQS in Detroit, Michigan, which is located within this District and Division.

## IV.
## BACKGROUND FACTS

22.     Defendant DQS operates approximately six (6) facilities across Michigan, Kentucky, Indiana, and Ohio, which provide general labor services to its business clients.[2]

23.     To provide its services, DQS employed (and continues to employ) numerous hourly laborers—including Plaintiff and the individuals that make up the putative collective and class.

---

[2] https://www.dqstaff.com/

24.     DQS employed the Plaintiff and the Putative Collective/Class Members to provide general labor type services to its business clients, such as porting (moving and parking) vehicles, assembly work, sorting parts, loading materials, and unloading materials.

25.     Plaintiff and the Putative Collective/Class Members' job titles include (but are not limited to): General Laborer, Forklift Operator, Inspector, Car Porter, Transporter, Sorter, Scanner, and Shipping and Receiving.

26.     DQS paid their laborers—Plaintiff and the Putative Collective/Class Members—a straight hourly wage for all hours worked but no overtime.

27.     Plaintiff worked exclusively for DQS in Detroit, Michigan from approximately October 2022 until July of 2023.

28.     Plaintiff and the Putative Collective/Class Members' job duties include porting vehicles, assembly work, sorting parts, scanning vehicle tags, loading materials, and unloading materials.

29.     While exact job titles may differ, these hourly employees were subjected to the same or similar illegal pay practices for similar work throughout DQS's facilities.

30.     Importantly, none of the FLSA exemptions relieving a covered employer (such as DQS) of the statutory duty to pay its employees overtime at one and one-half times the regular rate of pay apply to Plaintiff or the Putative Collective/Class Members.

31.     Plaintiff and the Putative Collective Members are similarly situated with respect to their job duties, their pay structure and, as set forth below, the policies of DQS resulting in the complained of FLSA violations.

**Plaintiff and the Putative Collective Members Were**
**Misclassified as Independent Contractors**

32.     Plaintiff and the Putative Collective/Class Members are similarly situated with respect to their job duties, in that as laborers their primary job duties included performing whatever manual labor DQS assigned to them for the day.

33.     Plaintiff and the Putative Collective/Class Members are similarly situated with respect to their pay structure in that they are all paid on an hourly basis and are all denied overtime compensation for hours worked in excess of forty (40) hours in a workweek.

34.     Plaintiff and the Putative Collective/Class Members are similarly situated with respect to the policies (and practices) of DQS resulting in the complained of FLSA violations.

35.     Specifically, DQS misclassified the Plaintiff and the Putative Collective/Class Members as independent contractors and denied them overtime compensation for all hours worked in excess of forty (40) each workweek.

36.     Based on the schedules set by DQS, Plaintiff and the Putative Collective/Class Members worked forty-eight (48) to sixty (60) hours nearly every (if not every) workweek they performed services for DQS.

37.     Plaintiff and the Putative Collective/Class Members were scheduled to, and did work an average of twelve (12) hours per day on the clock for three to five days per week.

38.     Plaintiff and the Putative Collective/Class Members qualified (and continue to qualify) as employees of DQS, as they were not in business for themselves and were economically dependent on DQS.

39.     Plaintiff and the Putative Collective/Class Members conducted their day-to-day activities within mandatory and designed parameters and in accordance with pre-determined operational plans created by DQS and/or their clients.

40.     Specifically, DQS created the work assignments and chose which work assignment each Plaintiff and Putative Collective/Class Member would perform for the day.

41.     Plaintiff and the Putative Collective/Class Members' daily and weekly activities were routine and largely governed by standardized plans created by DQS.

42.     DQS dictated how each work assignment was to be performed by the Plaintiff or Putative Collective/Class Member it assigned to the work assignment.

43.     When DQS assigned Plaintiff Daniels to work as a transporter, DQS drove Plaintiff Daniels and other Putative Collective/Class Members it assigned as Transporters for that day, out to the Ford assembly plant, provided them a list of vehicles to be moved, and told them where to move each vehicle.

44.     When DQS assigned Plaintiff Daniels to work as a scanner, DQS transported Plaintiff Daniels and the other Putative Collective/Class Members it assigned to be Scanners for that day, out to a yard, provided them a list of vehicles to scan, and directed them to scan the vehicles on the list with a scanner DQS provided.

45.     Plaintiff and the Putative Collective Members were prohibited from varying their job duties outside of the predetermined parameters.

46.     Specifically, Plaintiff and Putative Collective/Class Member had to perform the job duties they were assigned, in the way DQS directed them to.

47.     Moreover, Plaintiff and the Putative Collective/Class Members' job functions were primarily technical and manual labor in nature, requiring little to no official training, much less a college education or other advanced degree.

48.     The work performed by the Plaintiff and the Putative Collective/Class Members is integral to DQS's business, as the Plaintiff and the Putative Collective/Class Members perform the services DQS sells to its customers.

49.     Plaintiff and the Putative Collective/Class Members are blue-collar workers.

50.     They rely on their hands, physical skills, and energy to perform manual and routine labor.

51.     DQS determined the hours Plaintiff and the Putative Collective/Class Members worked.

52.     Specifically, DQS created the weekly schedules and determined when each laborer would clock in to start their day and when they would clock out to end their day.

53.     DQS set Plaintiff and the Putative Collective/Class Members' pay and controlled the number of hours they worked on a weekly basis.

54.     Regardless of any skills, Plaintiff and the Putative Collective/Class Members earnings were completely controlled by DQS and the number of hours it assigned them to work.

55.     DQS controlled when meal breaks would be taken, how long breaks would last, and altered daily work schedules at will.

56.     DQS set all employment-related policies applicable to Plaintiff and the Putative Collective/Class Members.

57.     DQS maintained control over pricing and marketing for the services it provides its clients.

58.     DQS owned or controlled most of the equipment and supplies that Plaintiff and the Putative Collective/Class Members used to perform their work.

59.     DQS had the power to hire and fire Plaintiff and the Putative Collective/Class Members.

60.     DQS made all personnel and payroll decisions with respect to Plaintiff and the Putative Collective/Class Members, including but not limited to, the decision to pay Plaintiff and the Putative Collective/Class Members a straight hourly wage for all hours worked with no overtime pay.

61.     DQS provided tools and equipment that Plaintiff and the Putative Collective/Class Members used.

62.     Plaintiff and the Putative Collective/Class Members did not employ their own workers.

63.     Plaintiff and the Putative Collective /Class Members worked continuously for DQS on a permanent, full-time basis.

64.     DQS, instead of Plaintiff and the Putative Collective/Class Members, made the large capital investments in leases, buildings, equipment, tools, and supplies.

65.     Plaintiff and the Putative Collective/Class Members relied exclusively on DQS for their work.

66.     Plaintiff and the Putative Collective/Class Members did not market any business or services of their own.

67.     Instead, Plaintiff and the Putative Collective/Class Members worked the hours assigned by DQS, performed duties assigned by DQS, worked on projects assigned by DQS, and worked for the benefit of DQS and its customers.

68.     Plaintiff and the Putative Collective/Class Members did not earn a profit based on any business investment of their own.

69.     Rather, Plaintiff and the Putative Collective/Class Members' only earning opportunity was based on the number of hours they were allowed to work, which was controlled by DQS and its customers.

70.     Nor did Plaintiff and the Putative Collective/Class Members bear any risk of losses associated with their work.

71.     DQS improperly classified Plaintiff and the Putative Collective/Class Members as independent contractors.

72.     The classification was improper because Plaintiff and the Putative Collective/Class Members were not in business for themselves.

73.     Instead, they were economically dependent upon DQS for their work.

74.     The FLSA mandates that overtime be paid at one and one-half times an employee's regular rate of pay.

75.     DQS denied Plaintiff and the Putative Collective/Class Members overtime pay as a result of a widely applicable, illegal pay practice.

76.     Plaintiff and the Putative Collective/Class Members regularly worked in excess of forty (40) hours per week but never received overtime compensation.

77.     DQS applied this pay practice despite clear and controlling law that states that Plaintiff and the Putative Collective/Class Members were DQS's non-exempt employees, and not independent contractors.

78.     As a result of DQS's misclassification of the Plaintiff and the Putative Collective/Class Members as independent contractors, Plaintiff and the Putative Collective/Class Members worked overtime hours for which they were not compensated at the rates required by the FLSA.

**Unpaid Waiting Time**

79.     In addition to denying Plaintiff and the Putative Collective/Class Members overtime compensation, DQS also failed to pay Plaintiff and the Putative Collective/Class Members for all compensable work time.

80.     At the start of the day, DQS knows how many work assignments it has for the Plaintiff and the Putative Collective/Class Members.

81.     DQS typically has fewer work assignments than available laborers.

82.     DQS also knows which work assignments it will assign each Plaintiff and Putative Collective/Class Members for the day.

83.     Instead of notifying the Plaintiff and Putative Collective/Class Members in advance, who will and who will not be assigned a work assignment, DQS requires every Plaintiff and Putative Collective/Class Member to report to its office at least one hour prior to the shift start time, to learn whether they will or will not work that day.

84.     Indeed, the Plaintiff and Putative Collective/Class Members only learn that they do or do not have a work assignment for the day, after waiting in line for hours and eventually making it up to the check in desk, where a DQS staff member tells them whether they will or will not work for the day, and what their assignment will be (if they receive one).

85.     Those who do not queue up at least an hour before shift start, may have their work assignment stripped from them, and given away to another worker.

86.     While waiting for their work assignment, Plaintiff and the Putative Collective/Class Members are not permitted to leave the DQS office area or make use of the time spent waiting.

87.     DQS benefits from the Plaintiff and Putative Collective/Class Members waiting for work assignments because, if a laborer who has a work assignment does not show up for the day, DQS is easily and immediately able to replace them with one of the waiting laborers.

88.     By requiring all laborers to appear each day, DQS is able to fill up its transportation buses immediately at the start of the day, regardless of which laborers miss the day, and does not have to call in workers to replace those who are absent, and wait for them to come to the office after being called in.

89.     Notably, DQS does not pay for the time spent waiting for assignments, even though such wait time is: (1) required by DQS; (2) benefits DQS; and (3) is not freely useable time by the Plaintiff and Putative Collective/Class Members.

90.     Worse yet, should the Plaintiff or Putative Collective/Class Member not have a work assignment for the day, they will not be paid for any of the hours of time they spent at DQS waiting to learn whether DQS had assigned them a work assignment.

91.     Plaintiff and the Putative Collective/Class Members typically spent one (1) or more hour(s) each day off-the-clock, waiting on work assignments.

92.     In weeks in which the Plaintiff and the Putative Collective/Class Members were assigned to four (4) or more work assignments, they typically worked forty (40) or more hours that workweek—not counting the unpaid waiting time at DQS.

93.     In those weeks in which the Plaintiff and the Putative Collective/Class Members were assigned to four (4) or more work assignments, the off-the-clock waiting time qualified as unpaid overtime hours in violation of the FLSA.

94.     In those weeks in which the Plaintiff and the Putative Collective/Class Members were assigned to fewer than four work assignments, the off-the-clock waiting time qualified as unpaid straight time, in violation of Michigan state law.

95.     As a result of DQS's failure to compensate Plaintiff and the Putative Collective/Class Members for compensable work performed off-the-clock, Plaintiff and the Putative Collective/Class Members worked straight time hours and overtime hours for which they were not compensated at the rates required by the FLSA and the Michigan state law.

96.     DQS knew or should have known that it was not (and is not) compensating Plaintiff and the Putative Collective/Class Members for the proper amount of overtime compensation in violation of the FLSA.

97.     DQS knew or should have known that its failure to pay the correct amount of straight time and overtime to Plaintiff and Putative Collective/Class Members would cause, did cause, and continues to cause financial injury to Plaintiff and the Putative Collective/Class Members.

98.     Because DQS did not pay Plaintiff and the Putative Collective/Class Members time and a half for all hours worked in excess of forty (40) in a workweek, DQS's pay policies and practices willfully violated (and continue to violate) the FLSA.

99.     Specifically, DQS knew such waiting time is compensable as it engaged the Plaintiff and the Putative Collective/Class Members to wait.

100.     DQS also knew, or had reason to know, that its classification of the Plaintiff and the Putative Collective/Class Members as independent contractors was incorrect and illegal as DQS treats the Plaintiff and the Putative Collective/Class Members no differently from its W-2 employee laborers, who work alongside the independent contractor laborers—Plaintiff and the Putative Collective/Class Members.

101.     Because DQS did not pay Plaintiff and the Putative Collective/Class Members for all straight time worked, DQS's pay policies and practices violated (and continue to violate) Michigan state law.

102.     Plaintiff and the Putative Collective/Class Members seek to recover all unpaid overtime, liquidated damages, and other damages owed under the FLSA as a collective action pursuant to 29 U.S.C. § 216(b), and all unpaid straight time pursuant to Michigan state law.

## V.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Collective Action Allegations)

**A.     FLSA COVERAGE**

103.     The preceding paragraphs are incorporated as though fully set forth herein.

104.     The "FLSA Collective" is defined as:

**ALL CURRENT AND FORMER HOURLY LABORERS WHO WORKED FOR DETROIT QUALITY STAFFING, LLC, ANYWHERE IN THE UNITED STATES, AT ANY TIME FROM OCTOBER 24, 2020, THROUGH THE FINAL DISPOSITION OF THIS MATTER.**

105. At all material times, DQS has been an employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

106. At all material times, DQS has been an enterprise within the meaning of the FLSA, 29 U.S.C. § 203(r).

107. At all material times, DQS has been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, or in any closely related process or occupation directly essential to the production thereof, and in that that enterprise has had, and has, an annual gross volume of sales made or business done of not less than $500,000.00 (exclusive of excise taxes at the retail level which are separately stated).

108. Specifically, DQS operates numerous work facilities in the United States, purchases materials through commerce, and conducts transactions through commerce, including the use of credit cards, phones and/or cell phones, electronic mail and the Internet.

109. During the respective periods of Plaintiff and the FLSA Collective Members' employment by DQS, these individuals provided services for DQS that involved interstate commerce for purposes of the FLSA.

110. In performing work for DQS, Plaintiff and the FLSA Collective Members were engaged in commerce or in the production of goods for commerce within the meaning of the FLSA. 29 U.S.C. §§ 203(b), 203(i), 203(j), 206(a), 207(a).

111. Specifically, Plaintiff and the FLSA Collective Members are (or were) hourly employees who assisted DQS's customers and employees throughout the United States. 29 U.S.C. § 203(j).

112.     At all material times, Plaintiff and the FLSA Collective Members are (or were) individual employees who were engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. § 207.

113.     The proposed class of similarly situated employees sought to be certified pursuant to 29 U.S.C. § 216(b), is defined in Paragraph 104.

114.     The precise size and identity of the proposed class should be ascertainable from the business records, tax records, and/or employee and personnel records of DQS.

**B.     FAILURE TO PAY WAGES AND OVERTIME UNDER THE FLSA**

115.     DQS violated provisions of the FLSA, 29 U.S.C. §§ 207 and 215(a)(2), by employing individuals in an enterprise engaged in commerce, the operation of a hospital, or in the production of goods for commerce within the meaning of the FLSA for workweeks longer than forty (40) hours without compensating such non-exempt employees for all the hours they worked in excess of forty (40) hours per week at rates at least one and one-half times the regular rates for which they were employed.

116.     Moreover, DQS knowingly, willfully, and with reckless disregard carried out its illegal pattern of failing to pay Plaintiff and other similarly situated employees overtime compensation for all hours worked over forty (40) each week. 29 U.S.C. § 255(a).

117.     DQS knew or should have known its pay practices were in violation of the FLSA.

118.     DQS is a sophisticated party and employer, and therefore knew (or should have known) its pay policies were in violation of the FLSA.

119.     Plaintiff and the FLSA Collective Members, on the other hand, are (and were) unsophisticated employees who trusted DQS to pay them according to the law.

120.     The decision and practice by DQS to not pay Plaintiff and the FLSA Collective Members overtime for all hours worked over forty (40) each week was willful and was neither reasonable or in good faith.

121.     Accordingly, Plaintiff and the FLSA Collective Members are entitled to be paid overtime wages for all hours worked in excess of forty (40) hours per workweek pursuant to the FLSA in an amount equal to one-and-a-half times their regular rate of pay, plus liquidated damages, attorneys' fees and costs.

## C.     COLLECTIVE ACTION ALLEGATIONS

122.     All previous paragraphs are incorporated as though fully set forth herein.

123.     Pursuant to 29 U.S.C. § 216(b), Plaintiff brings this action collectively on behalf of DQS's employees who are (or were) similarly situated to Plaintiff with regard to the work they performed and the manner in which they were paid.

124.     Other similarly situated employees of DQS have been victimized by DQS's patterns, practices, and policies, which are in willful violation of the FLSA.

125.     The FLSA Collective Members are defined in Paragraph 104.

126.     DQS's failure to pay Plaintiff and the FLSA Collective Members overtime compensation at the rates required by the FLSA results from generally applicable policies and practices of DQS and does not depend on the personal circumstances of Plaintiff or the FLSA Collective Members.

127.     Thus, Plaintiff's experiences are typical of the experiences of the FLSA Collective Members.

128.     The specific job titles or precise job requirements of the various FLSA Collective Members does not prevent collective treatment.

129.     All of the FLSA Collective Members—regardless of their specific job titles, precise job requirements, rates of pay, or job locations—are entitled to be properly compensated their overtime wages for all hours worked in excess of forty (40) each week.

130.     Although the issues of damages may be individual in character, there is no detraction from the common nucleus of liability facts.

131.     Absent a collective action, many members of the proposed FLSA collective will not likely obtain redress of their injuries and DQS will retain the proceeds of their violations.

132.     Moreover, individual litigation would be unduly burdensome to the judicial system. Concentrating the litigation in one forum will promote judicial economy and parity among the claims of the individual members of the classes and provide for judicial consistency.

133.     Accordingly, notice of the action should be promptly sent to the FLSA collective of similarly situated plaintiffs as in Paragraph 104.

**COUNT TWO**
**(Michigan Class Action Allegations)**

**A.     VIOLATIONS OF MICHIGAN COMMON LAW**

134.     All previous paragraphs are incorporated as though fully set forth herein.

135.     Plaintiff Daniels further brings this action pursuant to the equitable theory of *quantum meruit. See Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 195, 729 N.W.2d 898, 904 (2006).

136.     The "Michigan Class" is defined as:

**ALL CURRENT AND FORMER HOURLY LABORERS WHO WORKED FOR DETROIT QUALITY STAFFING, LLC, IN THE STATE OF MICHIGAN AT ANY TIME FROM OCTOBER 24, 2020 THROUGH THE FINAL DISPOSITION OF THIS MATTER.**

137.     The Michigan Class Members are entitled to recover their unpaid "straight time" or "gap time" wages for services rendered on behalf of DQS.

138.    These claims are independent of Plaintiff's claims for unpaid overtime wages pursuant to the FLSA and are therefore not preempted by the FLSA. *See Athan v. United States Steel*, 364 F. Supp. 3d 748, 755 (E.D. Mich. 2019). Plaintiff does not seek relief under state law that is available under the FLSA.

139.    Plaintiff Daniels and the Michigan Class Members provided valuable benefits—their labor—to DQS.

140.    DQS accepted Plaintiff Daniels and the Michigan Class Members' services and benefited from their timely dedication to DQS's residents.

141.    DQS was aware that Plaintiff Daniels and the Michigan Class Members expected to be compensated for the services they provided to DQS.

142.    Allowing DQS to retain the benefit of Plaintiff Daniels and the Michigan Class Members' labor without paying them for it would result in inequity.

143.    Plaintiff Daniels and the Michigan Class Members are entitled to recover pursuant to the equitable theory of *quantum meruit*.

144.    Accordingly, the Michigan Class should be certified as defined in Paragraph 136.

## B.    MICHIGAN CLASS ACTION ALLEGATIONS

145.    Plaintiff Daniels and the Michigan Class Members bring their Michigan common law claims as a class action pursuant to Rule 23 on behalf of all similarly situated individuals employed by DQS to work in Michigan since October 24, 2020.

146.    Class action treatment of Plaintiff Daniels and the Michigan Class Members' claims is appropriate because all of Rule 23's class action requisites are satisfied.

147.    The number of Michigan Class Members is so numerous that joinder of all class members is impracticable.

148. Plaintiff Daniels's Michigan state-law claims share common questions of law and fact with the claims of the Michigan Class Members.

149. Plaintiff Daniels is a member of the Michigan Class, her claims are typical of the claims of other Michigan Class Members, and she has no interests that are antagonistic to or in conflict with the interests of other Michigan Class Members.

150. Plaintiff Daniels and her counsel will fairly and adequately represent the Michigan Class Members and their interests.

151. Class certification is appropriate under FED R. CIV. P. 23(b)(3) because common questions of law and fact predominate over questions affecting only individual class members and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

152. Accordingly, the Michigan Class should be certified as defined in Paragraph 136.

## VI.
## RELIEF SOUGHT

153. Plaintiff Daniels respectfully prays for judgment against DQS as follows:

a. For an Order certifying the FLSA Collective as defined in ¶ 104;

b. For an Order approving the form and content of a notice to be sent to the FLSA Collective Members advising them of the pendency of this litigation and of their rights with respect thereto;

c. For an Order pursuant to § 16(b) of the FLSA finding DQS liable for unpaid wages, including unpaid overtime wages, due to Plaintiff (and those FLSA Collective Members who have joined in the suit), and for liquidated damages equal in amount to the unpaid compensation found due to Plaintiff (and those FLSA Collective Members who have joined in the suit);

d. For an Order certifying the Michigan Class as defined in ¶ 136, and designating Plaintiff Daniels as Representative of the Michigan Class;

e.      For an Order pursuant to the Michigan state law awarding Plaintiff Daniels and the Michigan Class Members damages for unpaid wages and all other damages allowed by law;

f.      For an Order awarding the costs of this action;

g.      For an Order awarding attorneys' fees;

h.      For an Order awarding pre-judgment and post-judgment interest at the maximum legal rate;

i.      For an Order awarding Plaintiff Daniels a service award as permitted by law;

j.      For an Order compelling the accounting of the books and records of DQS, at DQS's expense (should discovery prove inadequate); and

k.      For an Order granting such other and further relief as may be necessary and appropriate.

<h2 style="text-align:center">JURY DEMAND</h2>

154.    Daniels demands a trial by jury.

Date:   October 24, 2023                    Respectfully submitted,

By:     */s/ Jennifer L. McManus*
        **Clif Alexander**
        Texas Bar No. 24064805
        clif@a2xlaw.com
        **Austin W. Anderson**
        Texas Bar No. 24045189
        austin@a2xlaw.com
        **Carter T. Hastings**
        Texas Bar No. 24101879
        carter@a2xlaw.com
        **ANDERSON ALEXANDER, PLLC**
        101 N. Shoreline Blvd., Suite 610
        Corpus Christi, Texas 78401
        Telephone: (361) 452-1279
        Facsimile: (361) 452-1284

        **Jennifer L. McManus**
        Michigan Bar No. P65976
        jmcmanus@faganlawpc.com
        **FAGAN MCMANUS, P.C.**
        25892 Woodward Avenue
        Royal Oak, Michigan
        Telephone: (248) 658-8951
        Facsimile: (248) 542-6301

        ***Counsel for Plaintiff and Putative
        Collective/Class Members***